FERDINAND GIRARD *vs.* THE GROSVENORDALE COMPANY.

First Judicial District, Hartford, January Term, 1910.

BALDWIN, C. J., HALL, PRENTICE, THAYER and RORABACK, Js.

In passing upon a motion to nonsuit, the trial court is bound to assume the truth of such of the evidence introduced by the plaintiff as goes farthest in support of the allegations of the complaint, and to take into account every favorable inference that may legitimately be drawn from it.

A plaintiff who proves a prima facie case, though it may be a weak one, ought not to be nonsuited.

The plaintiff, a scourer in the defendant's cotton mill, was injured by a fall of the counter-shafting in a room to which he had gone in search of the overseer, who, as the plaintiff had been told by his immediate superior, desired to see him; and the parties were at issue as to whether, in remaining in that room in view of the dangerous condition of the machinery and shafting, the plaintiff had shown that he was in the exercise of due care. *Held* that he might properly be asked on his direct examination, for what purpose he was waiting in that room between the time he noticed the break in the machinery and the time when he was struck by the falling counter-shaft; but that enquiries as to his belief or expectation respecting the fall of the shafting, or whether the power of the mill would be shut down, were properly excluded.

While waiting in this room the plaintiff noticed that some children were directly underneath the defective machinery, and warned and drove them away. *Held* that it was for the jury to say whether he

knew the risk of remaining in that room and intentionally assumed it, or whether he was there pursuant to orders awaiting an interview with the overseer, who, it appeared, passed in and out of that room two or three times while the machinery was "pounding"; also that it was for them to say whether, if the plaintiff were negligent, the proximate cause of the injuries was such negligence, or the omission of the defendant, after notice of the dangerous situation, to take proper means to protect those of its operatives who were or might be exposed to the peril.

Argued January 4th—decided January 19th, 1910.

ACTION for personal injuries received by one of the defendant's employees in the course of his employment, brought to the Superior Court in Windham County and tried to the jury before *Bennett, J.* A motion for a nonsuit was granted, and a motion to set aside the nonsuit denied. *Error and new trial ordered.*

*Donald G. Perkins,* for the appellant (plaintiff).

*Charles E. Searls,* and *Edward C. Stone* of Boston, for the appellee (defendant).

BALDWIN, C. J. This cause came before us at a previous term on an appeal from a judgment for the plaintiff, and the averments in the complaint, as well as certain conceded facts, are stated in the report of our decision. 82 Conn. 271, 73 Atl. 747. On the second trial the evidence introduced by the plaintiff was such that, if taken in the most favorable light for him, the jury would have been justified in regarding it as sufficient to establish, among other things, the following state of facts:—

While scouring a frame in a room in the fourth story of the defendant's mill known as the "new room," from which a door opened into a smaller room known as the "ell spinning room," one Johnson, the "second hand," or second in authority in the new room, told him that the overseer of both rooms and also of the "warp room" in

the second story (one Eaton) wished to see him (Girard) after he had finished the work he was then engaged in. As soon as he had finished it he went to Eaton's office, which was on the second story, and, not finding him there, returned to the "new room," and thence went into the ell spinning room. His purpose in going into the latter was to find Eaton. As soon as he went through the door, he saw that Eaton was not there, and also observed that a metal pulley, forty-two inches in diameter, was broken and out of balance. The break had occurred a few minutes before. He saw that the pulley was "thrashing and beating" in a way to shake the shafting with which it was connected, and the hangers by means of which the shafting was suspended from the ceiling. He knew that this might affect the counter-shafting, which was hung under the ceiling and connected by belting with the main shafting, and that if the main shafting dropped, it would be likely to pull down the counter-shafting. He did not, however, think the main shafting would drop. He learned that Eaton had been sent for, and, expecting him to come soon, waited a little while for him to appear. In the meantime he (Girard), noticing that some boys and girls, employed in the ell spinning room, were directly under the main shafting at the point where the pulley was, stepped into the room and chased them away, fearing that bits of the pulley might break off and do them harm. Eaton then came in, through a door, called the "card room door," at the other end of the room; looked at the pulley; and went out. The plaintiff felt sure that Eaton would give him no orders until the pulley had been attended to, and did not address him. After a little while he (Eaton) returned, stopped a short time, and went away again. Very soon afterward Eaton again returned, and then again started to go back. Soon after Girard entered the ell spinning room, Johnson entered it, observed the broken pulley, and was told by Girard that Eaton had gone down to order the power shut

off. Johnson remained, looking at the pulley four or five minutes, until the shafting fell. Another scourer had come there after Girard, and told him (Girard) that the second hand of the warp room had gone down to the engine-room and told the engineer to shut off the power, and that they were going to do this. The steam could have been shut off by the turn of a wheel, in two seconds, but it would have been two minutes before everything would have come to a full stop. Girard, on a previous occasion, had seen a pulley broken in a similar way, at the same point, and knew that then the power had been promptly shut off. On this occasion it was not shut off until some five minutes after he first entered the ell spinning room, nor until part of the counter-shafting had fallen upon the plaintiff, causing the injuries which were the subject of the action.

The main shafting of the room, if properly constructed, ought not to have fallen, in consequence of such a break in the pulley, until there had been time to shut off the power, after notice of the break. Girard was in the middle of the ell spinning room, fifty or sixty feet from the broken pulley, when he saw the shafting give way. He then ran toward the card room door, but was struck before he reached it. During all the time the plaintiff was in the ell spinning room he had occupied himself in keeping the boys and girls on the side of the room away from the neighborhood of the pulley.

The plaintiff was fifty-three years old at the time of the accident, and had worked for the defendant at the same mill for the previous fifteen years. He was a French Canadian, and, although he had resided in the United States since he was eighteen years old, spoke English somewhat imperfectly.

Beside the door leading from the new spinning room into the ell spinning room was a glass signal-box equipped with a hammer by which the glass could be broken. There was a signal switch inside, that, if turned, sounded a gong,

which was a signal to the engineer to shut off the power instantly. The plaintiff knew all this, but had no authority to give such a signal. The overseer (Eaton) had authority to give it, and to instruct his second hand, and "any responsible person" under his charge, to give it, in case of accident, when it seemed likely that to shut off the power would prevent or lessen damage. Neither the overseer (Eaton) nor the second hand (Johnson) made any use of the signal-box on this occasion.

At the moment when the counter-shafting fell, a machinist with a sledge hammer was entering the door, who had been sent by his superiors to break off the pulley. The power had not then been shut off.

On the direct examination of the plaintiff as a witness in chief, he was asked whether, while in the ell spinning room, after observing the break in the pulley, he expected the shafting to fall; whether there was then anything that led him to believe or expect that it would fall; whether he expected that the power would be shut down; whether he had any belief, or expectation, or knowledge, that it would not be shut down; and what he was waiting in that room for, between the time when he noticed the break in the pulley and the time when he was struck by the falling counter-shaft.

The last of these questions should have been admitted. The answer might have been such as to raise a point which the plaintiff would have had a right to present to the consideration of the court.

The other questions were properly excluded. *State* v. *Campbell*, 82 Conn. 671, 74 Atl. 927.

The jury were instructed in substance, at the original trial of this cause, that if the plaintiff's injury were due to the defendant's negligence in continuing to operate the shaft and pulley after the latter was broken, he could recover, although he had assumed the risk of injury from such negligence. We held this charge to be erroneous,

and a claim that it did no harm because the trial court might, under the conditions proved, have withdrawn the question of assumed risk from the jury, was dismissed with the observation that it could not properly have been so withdrawn, because it was not conceded or established that there was anything which could be regarded as a promise by the defendant, or its equivalent, inducing the plaintiff to remain where he was. The question is now approached from the other side. Whether, upon the evidence produced by the plaintiff, he knew what risk he incurred by staying in the ell room, and intentionally assumed it, was a proper matter of determination for the jury. The Superior Court so ruled, and also properly held that there was sufficient evidence on which to go to them on the question of the defendant's negligence. It erred in denying the motion to set aside the nonsuit on the ground that the plaintiff had failed to show that he was in the exercise of due care, when and where he sustained his injuries. Whether that had been shown or not, on the evidence before them, was for the jury to say.

In passing upon the motion, the Superior Court was bound to regard the truth of such of the evidence introduced by the plaintiff as went farthest in support of the complaint, as admitted, and to take into account every favorable inference that might legitimately be drawn from it. It was enough if he had thus made out a prima facie case, though it might in the opinion of the court be a weak one. "A party has the same right to submit to a jury a weak case as he has to submit a strong one." *Cook* v. *Morris*, 66 Conn. 196, 211, 33 Atl. 994.

In part of his testimony the plaintiff stated that he remained in the ell room because he was awaiting an opportunity, which he believed would very shortly occur, to report to Eaton. In another part he stated that he remained there for two purposes: one that he might report to Eaton, and the other that he might keep the boys and

girls away from the vicinity of the pulley. The jury might have given more credit to the former statement than to the latter, and come to the conclusion that his trying to get the children out of harm's way was a mere incident of his obedience to the order of the second hand, in response to which he was trying to secure an interview with the overseer.

It is unnecessary to inquire, on this appeal, what legal consequences might attach to such a conclusion, if formed. They were also entitled to consider whether any inferences, and, if any, what, in regard to the plaintiff's conduct in remaining in the ell room so long a time after the breaking of the pulley, could properly be drawn from the presence there of Johnson, his superior in authority, who had sent him to seek Eaton, as well as of Eaton himself, the superior of both, and the absence of testimony that either objected to what the plaintiff was doing. Furthermore, it was for the jury to say whether, if the plaintiff were negligent, the proximate cause of his injuries was such negligence, or the omission of the defendant, after notice of the dangerous condition of the machinery, to take proper means to protect from bodily harm those of its operatives who to its knowledge were or might be exposed to peril from it. *Smith* v. *Connecticut Ry. & Ltg. Co.*, 80 Conn. 268, 270, 67 Atl. 888.

There is error and a new trial is ordered.

In this opinion the other judges concurred.